The next case is Oldham v. Penn State et al., 22-2056. Ms. Crosson. Oldham v. Penn State et al., 22-2056. A few years ago in Dovey Brown University, the First Circuit, in its now very much cited footnote six in Dovey Brown University, noted that Title IX standing extends to any member of the public who is discriminated against when availing themselves of university programs, whether it be a library, sporting events as here, public lectures, any program of the university. And indeed, the Middle District of Pennsylvania itself, in the Winter case, had noted that Title IX was drafted to cover any person, not just any student. And yet, the court below elected to follow the very ill-conceived outlier decision in the Kahnweiser case and held that because Ms. Oldham was not a student or similarly affiliated with the university, she could not plausibly allege that she had been excluded from university programs. However, coincidentally, during and after the briefing of this case, there has been a flurry of decisional activity. First, the Sixth Circuit, roughly contemporaneously with the filing of our opening brief, decided the Snyder-Hill v. Ohio State case. How closely aligned are the facts in Snyder-Hill to your client? If anything, I would say that in terms of her posture, her relationship to the university, it was a closer relationship than a prospective student touring the campus, so very casual contact with the university. Do you mean with regard to other aspects of the other elements of the Title IX? Yes. Good question. Well, they were both actually very comparable facts. As I recall, the Snyder-Hill plaintiffs were all complaining of an apparently very active sexual assailant on campus who had molested all of them at various points. So the initial discriminatory action was the same, and the universities similarly were deliberately indifferent. Does it matter that the sexual assault in this case took place off campus? It shouldn't, Your Honor, because the assistant coach who assaulted our client was traveling on behalf of the university under the university's own written regulations. It is specified that as long as he is traveling for the university, he is a representative of the university. So let me just tease out a little bit of how I see Title IX getting put together. It's a statute. Congress enacted it. It has no express cause of action in it. The Supreme Court solved that problem in Camden, and it says, yes, there's an implied cause of action. But when we look at statutory standing, it's easiest. It's much easier when you have an express cause of action because we can say, aha, here's what's protected, and here's who can sue. So now what we're up to the task of doing, at least as I see it, is looking at Title IX to see what it protects. But then we're having to look at canon, really, to see who can sue based on what it protects. And it doesn't always mean that what's protected is actionable. It can be that case, but it's not necessarily that case. And so in some ways, it seems that what you're asking us to do is read canon such that the implied cause of action, and this is the problem with implied causes of action, there's uncertainty associated with parts of them. But really what you're asking us to do is to say that the implied cause of action in canon covers anything and everything that Title IX otherwise protects. If we do that, then it seems that your client does have standing. But it's a difficult task because it's an implied cause of action, one that we have to look and see how strong the implication was, what the Supreme Court was thinking for that implied cause of action. And should we look at it only in terms of the facts or the statements used by the Supreme Court for what that cause of action was? So it seems that this case is an opportunity to match the scope of what canon gave to the scope of what Title IX protects. You win on the Title IX action, which you're only bringing against Penn State, I understand, not the individual capacity. You win, as far as I can tell, if they match. And so what I'm most curious in is why should we view the implied cause of action in canon as extending to everything that Title IX might otherwise protect? Well, Judge Phipps, four federal circuits are now unanimous in concluding, as there was some very nice language in the Seventh Circuit's decision in the TS case, where they conducted a rather elaborate analysis of the zone of interest and concluded that we do not ask whether Congress had this specific plaintiff in mind. We'd rather look to the asserted interest. And here, Ms. Oldham has a classic retaliation claim. She was, albeit that she was a reluctant complainant in the case, she only pursued this when a third-party witness complained. She was retaliated against. I get all of those facts. Let me just give you a counter example. The Age Discrimination and Employment Act says age discrimination is illegal. Persons over 40 can sue. So if you're 27 and you're a victim of age discrimination one way or the other, they like older people or younger people more than you, you can't sue. Because Congress said persons over 40 can sue. Age discrimination is legal, but persons over 40 can sue. The question here is, Title IX says a lot of things are illegal. The question is, who can sue under the implied cause of action? And you've got to match at least what your client's bringing with what is protected. And you have to show that there's not some disconnect between what the statute protects and who has a right of action. And so what I'm really asking you is, and I'm willing to say you win if there's no disconnect. I'm just wanting to know why you think there's no disconnect between canon and the statute. There's no disconnect at all, Judge Phipps, because if you look at the complaint at paragraphs, I believe it's 101 through 111. Our client specifically alleges that she was excluded from educational activities, which is exactly what the statute is designed to protect. She was excluded from, she specifies two fencing tournaments that the hostile environment created by the defendants excluded her from, as well as workshops at Penn State. These are master class kinds of workshops that are essential for professional development in the fencing world. And we could get into the exclusion of her students from recruitment and scholarship opportunities as well. That's probably, when I thought about it, that's probably more of an Article III injury than Title IX standing, because she had an actual injury from the secondhand retaliation against her students. But she has very concretely alleged the harms to her that were the core mission of the statute. Before you sit down, before you sit down, could you also address briefly the equitable tolling issue, which is really another threshold issue here? Yes, Your Honor, and that was the other very essential point I wanted to get to. My time is up. Please go ahead. Okay. One second. We have cited to the court the Nichol B v. School District of Philadelphia case, which should put to rest the defendants really misrepresented to this court and the court below, the equitable tolling rule in Pennsylvania. The Nichol B case makes it clear that the Pennsylvania Supreme Court has not only embraced the same rule as the federal courts apply, including equitable tolling where a plaintiff has asserted rights in a timely fashion but in the wrong forum, as here. But if you look at, I'd call your attention to at 661 Pennsylvania at 650, the court specifically rejected the argument that this equitable question is one for the legislature, and it went on to grant equitable tolling on a state law issue on non-fraud grounds. So it is simply not the case that equitable tolling under Pennsylvania law is limited to fraud. Thank you, Your Honor. Thank you. Good morning. Good morning. Ms. Pecola? It is, yes, Your Honor. Good morning. May it please the court. My name is Amy Pecola, and together with my colleagues from Saul Ewing LLP, I have the privilege of representing the Pennsylvania State University and Christopher J. Harris in this appeal. If I would, during my time, I would like to address the Title IX standing issues, and to the extent Your Honors are interested, any of the state law tort claim issues relevant to the university, reserving time for Mr. Lutzky and Ms. Balagorski to address the defamation and equitable tolling issues relevant to the battery claim. That's fine. But let's get straight to the standing because that's the issue here. Absolutely. I think as a starting point, Ms. Oldham does not have statutory standing under Title IX, and she presented here today and in her briefing a bit of what I would say is a straw man argument around the framing of the issue. No one disputes, of course, that she's a person, and no one disputes, of course, that the scope of Title IX at its outset speaks of any person. The question here is really when that person can bring a claim under Title IX. Well, there's also no dispute she was assaulted, sexually assaulted by an employee of Penn State, correct? That's correct. The dispute is really about whether that assault and the alleged sex discrimination occurred within Penn State's program or activity, which is essential. He was an employee of Penn State, right? He was an employee of Penn State, yes. And he had to answer to Penn State, right? He did, yes, Your Honor. This took place on a Penn State activity, right? It did not, Your Honor. This took place on a commercial flight. I get it. On the way home or on the way to a tournament. But it was Penn State business that he was traveling on, right? That's correct. I would just say, Your Honor, that with respect to the assault itself, this is an issue that the district court did not need to delve into terribly deeply, one, because of the standing issues, but also because of the statute of limitations as would be applied to Title IX. That assault occurred in 2017. Ms. Oldham did not bring her claims relevant to that assault or otherwise until 2020. She brought them in North Carolina. That's correct. We'll get to the statute of limitations later, but continue telling us why there's no standing here. That's correct. Starting from the Title IX zone of interest, which I think we all have agreed in our briefing is the essential starting point, when you look at the plain language of the statute, what's required is that a plaintiff establish that they were either excluded from participation in, denied the benefit of, or subjected to discrimination under a program or activity. And in North Haven Board of Education v. Bell, the Supreme Court, in looking at that plain language and questioning whether the private right of action under Title IX extended to employees in addition to students, said that what would be required is direct participation in the education program or activity, directly benefiting from that education program or activity, or when it comes to discrimination under, having inferior access to or different access than someone of the opposite sex. None of those allegations are present in Ms. Oldham's complaint. The question was posed at the outset of whether or not it mattered that Penn State and Oldham were essentially strangers to another. And I would propose here that that is the end of the discussion. Let me just ask this question. I started at the starting point with your opposing counsel with this Cannon v. University of Chicago case, because it seems to be, you know, implied cause of action, Title IX, certain amount of uncertainty. Supreme Court fills in what Congress didn't agree to, basically. That's fine. But the question is, in Cannon, there was allowed to be a Title IX claim for a woman who was, I believe, an applicant for employment with a university. Now, Title IX now extends to athletic programs. That's kind of unquestioned. And Ms. Oldham is an applicant to participate in athletic programs, and she's being denied that. So if I put together Cannon, applicants for employment have Title IX claims. Clearly, Supreme Court made that true. And Title IX also applies to athletic programs. And Ms. Oldham is an applicant for an athletic program. Then why doesn't she have a Title IX claim? I would agree, Your Honor, with all of that, except for Ms. Oldham alleging that she was an applicant to participate in Penn State's athletic programs. So, Ms. Oldham alleged... Doesn't she allege she was precluded from participating in Penn State-sponsored fencing camps or tutorials? She doesn't, Your Honor. And that's where, you know, the briefing takes some liberties with what was actually pled in the first amended complaint. What the first amended complaint says is that events for prospective students and current collegiate students occurred sometimes on Penn State's campus. And so assuming that that is enough to fall within the ambit of a program or activity. What she says is that with that one specific allegation, that she was not able to attend. She felt that she couldn't attend. Those programs and activities were not targeted to somebody, a private fencing instructor who was not there to participate in the fencing tournament. Who was not there as a collegiate or pre-collegiate competitor. So taking as a given that Penn State's athletics program is within its operations and thus within its education program or activity. The factual hook that's missing in Ms. Oldham's complaint is that she was attempting to participate in that program. She was essentially a bystander even under those facts. So if Penn State said that our next football game, the only people that can attend are males. No women can attend the football game. Would the answer be, well, yeah, no, they aren't actually participating. We put on that game to compete for our athletes, to compete against Ohio State's athletes or somebody else's athletes. And therefore, no Title IX problem. Just only men in the stadiums. The women who are excluded don't have standing. Well, I think we would need to look at the class of potential plaintiffs there. So certainly Penn State students or Penn State employees. Just fans who have no other tie to the university. So you say non-students. So the women students can attend. But the public at large, only men. I think the question there is whether that's a problem under Title IX or otherwise. Now certainly Penn State as a public institution has broader anti-discrimination obligations. Right, right. But I want to know, is that not a problem under Title IX? You say that would happen. Penn State does that. It's hypothetical. The blowback would be unreal. Right. But the point is just no Title IX. You might say there's other claims. There's other issues here. There might be equal protection. A bunch of other angles. But the question is, you would say there's no Title IX claim for that? Yes, Your Honor. I think arguably when we're talking about the strangers in that equation, whether or not Title IX is the right cause of action, were they attempting to participate in the program or activity versus watching the program or activity? I think there would be an argument to be made. And I would just… How do you reconcile that position with Doe versus Brown? Where the circuit said that members of the public regularly avail themselves to the services provided by educational institutions receiving federal funding. For example, and I give examples such as public lectures, campus tours, sporting events. I see I'm out of time. May I answer? Thank you, Your Honor. I would just take a step back on Doe versus Brown to one point out that that statement was dicta in a footnote. When we look at that case… I understand that. But can you reconcile that statement, that dicta, with your position? Other than being able to say that I think fundamentally that is far too expansive a view of the scope of Title IX. It would essentially obliterate the requirement that there be some direct connection and some direct participation in an education program or activity. Absolutely. And Ms. Oldham was very much akin to the plaintiff in Doe versus Brown University who was found to not have a Title IX claim, notwithstanding the fact that she was assaulted by Brown University students and who said that she was directly impacted. She was not able to continue on her own college education, et cetera, because there was not enough of a tie. That wasn't enough of a hook. And that's essentially what Ms. Oldham is arguing here. What about our opinion in Hall versus Millersville where we held that it is not unreasonable to hold a university liable for conduct of a non-student, non-employee whose conduct against a student or employee violates Title IX? I think… I would not disagree that the scope of Title IX can, in certain circumstances, extend to non-students and non-employees. It's the fundamental was this individual participating in a program or activity, which is, I think, the hook that was used in the Millersville case. It seems to me, though, that you're reading in a term to kind of the analysis with the word participate. You want to say direct participation. And maybe if participate does have that modifier, then you're right. But you have to kind of – why should we have – why should we read indirect as opposed to indirect participation or ancillary participation or all forms of participation without that modifier that acts really as a delimiter in your client's favor, of course. That's why you're advocating for it. But why should we read in the word direct? What's the source in law for that? And why should we accept that? North Haven Board of Education v. Bell, the U.S. Supreme Court, did, in fact, use the word direct when talking about direct participation, direct benefit with regard to the first two clauses of Title IX. And then the discrimination under it was saying, once we assume you are participating in, if you are treated differently from someone of the other sex. In fact, the Doe v. Brown University case, that's cited with sort of the – this, of course, makes sense. I believe the words that were used in the First Circuit was this would be logical because otherwise all sex discrimination, all sexual harassment that happened in the world, if somebody could have even one sort of iota or touchpoint with a university, it would be within the scope of Title IX. And that can't quite be right. That's not the world we're living in in this case. This is not one iota of connection to Penn State. I mean, you've told us that he was employed by Penn State, he was on Penn State business, et cetera. Why don't we follow the logic of Snyder Hill? I think the Snyder Hill case, if we look at, you asked, Your Honor, the excellent question of do the facts in Snyder Hill align. I would suggest to you that they don't. When you look at the plaintiffs, and it's a large class of plaintiffs in Snyder Hill, we're looking at individuals like students who are participating in Ohio State summer camps, individuals who had contracts with the university to serve as referees, individuals who were on campus and were going on tours. They understood to understand what it was like to be an Ohio State employee, and they were then assaulted by an employee in that context on the campus. And so here, when we look at the facts, Ms. Oldham could not be further from those facts. What I would also suggest, though, is that the Sixth Circuit takes Title IX a step too far. And of course, it's probably unsurprising to Your Honors that I would have to agree with the vociferous dissents that came out in both iterations of the Snyder Hill case. And this is a case that we will see. There is a pending petition for writ of certiorari to answer these exact types of questions. Have we obliterated the meaning of standing under Title IX by assuming that anyone who happens to step foot on campus into a library or otherwise has standing under the statute? Why don't you give us your position on the equitable tolling issue? Absolutely. I think the equitable tolling is a clear issue. Pennsylvania statute says that in Pennsylvania, this third prong of equitable tolling, this idea that I filed in the wrong forum, gives me the ability to toll the statute. Recognizing that the case law is less than clear in some broad sort of explanations of the equitable tolling principle, which is different otherwise, I would suggest to you looking at Poole v. Marks out of this very court where the court said in Pennsylvania, judicial extensions of the statute of limitations are expressly forbidden absent fraud or its equivalent. And that's not what has been alleged here. Is that consistent with the Pennsylvania Supreme Court says? It is. The Pennsylvania Supreme Court in the case that was referenced earlier today and submitted to the panel in advance of oral argument actually doesn't address the difference between the broad, more lenient federal standing standard, excuse me, and the narrower Pennsylvania state exception. That case is very focused on an equitable tolling provision in the PHRA, which, of course, is a statute that's not the subject of today's discussion and was not relevant to the complaint. In citing to other opinions out of the Commonwealth Court, what the Pennsylvania Supreme Court is doing is essentially demonstrating that equitable tolling is a broad concept. That's also that's often construed and constructed differently court by court, but does not directly take on the issue of the difference between the broad, more lenient federal standard standard, excuse me, and the narrower Pennsylvania standard. On the wrong on this kind of tolling issue with the if. If it would be untimely, regardless, under the Pennsylvania statute of limitations, do we even care about tolling? If that makes sense, if we're now under Pennsylvania law and you say I originally filed in North Carolina, I'd like to toll it. But if it even if it were told if it would have been late to begin with, had it been originally filed in Pennsylvania, do we care about tolling anymore? Is there some world that we care about that? Or am I missing something? If you're missing it, your honor, I am missing it as well. I think if the if the statute of limitations would have otherwise applied, even with the benefit of equitable tolling, then absolutely. The statute of limitations would apply. No further questions. Thank you. Your honors. Good morning, Mr. Lutzky. Is that right? Yes, sir. Good morning, your honors. May it please the court. My name is Jeff Lutzky and I will be addressing the defamation claim and the court's dismissal of that claim. The district court accurately described the plaintiff's defamation claim as deeply flawed. Did the district court impose pleading requirements beyond what's expected? No, because basic to any defamation claim is the publication of a defamatory statement to a third person. In fact, the Pennsylvania law requires that it be shown that the recipient understood it was defamatory and the recipient understood it applied to the plaintiff in North Carolina law, by the way, is no different. And here there is no third person, no recipient identified whatsoever in these pleadings. There is a reference to testimony given in a safe sport arbitration. But as the plaintiff conceded, that statement is not actionable because it's immunized. It has immunity. There are no specific defamatory discussions in the first amended complaint. The briefing of the plaintiff points to three discussions, none of which are supported by the first amended complaint. The first is a discussion with a coach at Kofanty. The allegation of that discussion in its entirety is 14 works. I could read those words to you. They're in paragraph 40 of the first amended complaint, but they have no statement by coach gone at all. Never mind the defamatory statement. She also points to a meeting in April between coach Kofanty, coach gone and the plaintiff. Again, there are no allegations that gone to famed her in this meeting either in the first amended complaint. And finally, she points to a conversation allegedly had with the U.N.C. head fencing coach Ronald Miller, in which she says gone, quote, called the U.N.C. fencing coach to see if he can do anything about Jennifer. Again, there is no defamatory statement present in that allegation. In fact, the plaintiff very openly says instead of relying upon a specific defamatory statement to a third person, she speculates that coach gone must have called her a liar because it stands to reason if he did so in testimony, then he must have done so throughout the fencing world, both domestically and even internationally. Yet she does not identify a single conversation that ever took place in which he apparently defamed her. At the same time, she claims she needs discovery on the one hand to find out what he said and to whom. But then astonishingly claims she does have the details of those conversations, but she refused to plead them in her words, discretion being the better part of valor. She obviously can't have it both ways. She can't claim to have the aces and then refuse to show the whole cards. She can't have it both ways. The law of defamation requires a lot more than rank speculation and claims of secret, undisclosed evidence. It doesn't rest on assumptions and inferences. As a district court, I think correctly held, and I'm going to quote this language, unspecified defamatory statements made on unknown dates at unspecified locations to unidentified fencing colleagues lack the particularity required to sustain a claim for defamation. I will note that while the plaintiff accused the district court and in fact, the entire middle district bench of bias on at least six occasions in her briefing, Judge Brand applied the law dispassionately and correctly and dismissed with prejudice after plaintiff refused his invitation to a man where she decided to stand on her complaint. He dismissed that claim as a matter of law properly, and we request that that be affirmed by this court. Thank you very much. Is it valid Gorski? Yes, Your Honor. Good morning. Good morning. I may please the court. My name is Lee Grace. Fella Gorski. I'm with the law from Gleason, Cherry and Cherry on the western side of the state in Clearfield County, Pennsylvania. And I represent George apposition. As far as the battery count goes, the district court correctly concluded that the battery claim was barred by the statute of limitations, which was also conceded by Miss Oldham in her brief that the assault occurred outside of the relevant limitation of the two year statute in Pennsylvania. So referring back to your honor's question about the equitable tolling. In fact, it doesn't apply at all because the battery that took place was originally outside of that two year statute. Limitation is essentially barred. If we use the North Carolina statute limitation, though, it would be timely, right? If you use that correct, it would be because that is three years and the assault took place in 2017 and Miss Oldham filed in North Carolina in 2020. Why shouldn't we? Maybe you're going to get this. Why shouldn't we use the North Carolina statute? Because the district court did conclude that the choice of law was correct to use Pennsylvania. And in fact, Miss Oldham did concede and pled affirmatively to using Pennsylvania law in her first amendment. Excuse me. First amended complaint in paragraphs 18 and 22 specifically. So given that the we believe that the district court did appropriately apply and conclude that Pennsylvania law was the correct choice of law. And in turn, the statute of limitations in Pennsylvania for a state to our claim of battery is two years. Therefore, the equitable tolling does not apply in that it does not relieve fraud or its equivalent. Since no, no element of fraud was ever pled by Miss Oldham, that that is why she did not file her claim appropriately within that that period of time. Now, while Miss Oldham does try to argue that this court's decision in O'Shiver should apply, given that if you file in the wrong forum, however, that being the federal standard, she does not then look narrowly into the Pennsylvania more restrictive standard that requires fraud to be pled in order for that equitable tolling to be applied. So we believe that the district court did did correctly conclude that the battery claim was barred by the statute of limitations. The two years in Pennsylvania. Additionally, your honors, we don't believe. That the Nicole case that Miss Oldham has referenced today applies as well, because the the holding in that is is entirely dicta. And again, it is very specific to the PHR a equitable tolling provision, and it doesn't apply in this case, nor does it apply the restrictive standard in Pennsylvania concerning state based tort claims. And so for that, we would ask that you affirm the district court's decision. Thank you very much. Thank you, your honors. One second.  Can we take a five minute recess? Sure. Yeah, we'll take a five minute recess. Yeah. Thank you. Please rise. Court is now in session. Thank you. Please be seated. Certainly, your honor. No, no problem. Technology is great when it works. Understood. A couple of quick points in response to the items that seem to have occupied your interest. Judge Phipps, I think you hit the nail on your head on the head when you posited that Miss Oldham is an applicant to participate in athletic programs at Penn State. Again, if you look at paragraphs 101 to 111, she details this in considerable concrete detail. Perhaps the easiest item on that list to understand in terms of accessing a Penn State program would be the master classes in fencing that we talked about. She would attend those and was seeking to attend those, would have attended those, but for the retaliation and very analogous, very comparable to someone who wanted to attend a graduate seminar. Some outside scholar who went to, let's say, a symposium on international relations. This is the same kind of master class in fencing that is essential for professional development. So if I may, it strikes me that your response does not dispute Penn State's position that participation, thanks to the Supreme Court's clarification later, must be direct participation. You agree with that. What you're saying is that you've got allegations, at least with respect to the master class, that satisfy the directness required for participation. Is that right? Yes, Judge Phipps. Okay. We are not asking for Title IX to cover all the sex discrimination in the world, as Penn State argued. If you look at the examples of the people and their zone of interest that were deemed to be covered in the Snyder Hill case, I would say they had a less direct interest of the type that is covered by the statute. A prospective student who was merely on a casual visit to the campus, very informal tour of the campus. On the other hand, the Snyder Hill court, affirmed by the en banc in denying review, incidentally. Contentiously. Recognized standing on the part of summer camp attendees, very comparable to a coach and her athletes attending these invitational tournaments at Penn State. In terms of her being a direct beneficiary, one of the early Supreme Court decisions, I believe it must have been Bell, actually noted that if Congress had intended to cover only students or beneficiaries, they would have used that term instead of any person. On the defamation claim, the allegations of the complaint are ample to provide the defendant's notice as to the statement they are alleged to have made, the defamatory character of those statements, and to whom. We know exactly what the coaches were saying. That Ms. Oldham was a liar, that she wrongfully accused him of the sexual assault, and that she did so for insidious purposes to somehow bolster her career. They have consistently shared that narrative with anyone who would listen in the fencing community. And it's a more than reasonable inference that they have continued to say it because the issue has continued to roil with proceedings against Mr. Glahn up to a few months ago before Safe Sport. In conclusion, but for Penn State's failure to train and constrain its fencing coaches, Ms. Oldham would today be progressing in her once promising career in collegiate fencing. Now she will likely never have that career, so effectively have the coaches poisoned the well in the collegiate world. We ask this court to hold that she has Title IX standing, that her tort claims are timely, that North Carolina law governs those tort claims, to reverse the dismissal of all claims and remand for further proceedings. Thank you. If I may, please. I have one question. Yes, sir. This is a follow-up, but I want to give you a chance to respond to a point made. On count five for battery, it's timely if North Carolina law applies, but it's untimely if Pennsylvania law applies. Your opponent said that you've conceded that Pennsylvania law applies based on paragraphs 18 and 22 of the amended complaint. Did you concede that Pennsylvania law applies? Not at all, Your Honor. There is some boilerplate language in the complaint, which was not intended to concede that at all. And I had hoped to address the choice of law point. When Pennsylvania adopted the restatement standards for choice of law, it really was a tweak to the doctrine and not a sea change at all, especially as applied to tort claims. The Pantera Rail case made this very clear, citing, I believe, Section 145 of Restatement Second on torts and noting that when it comes to torts, the standard is still very much centered on the factor of where the injury is felt. And here, although actions relevant to the Title IX violations may have occurred in Pennsylvania, almost none of the relevant conduct pertaining to the torts did. The assault happened in no discernible jurisdiction. The initial attempts to intimidate Ms. Oldham happened in Durham, North Carolina, and in Virginia. The defamatory campaign occurred at fencing venues across the country. And, of course, all injury was felt to Ms. Oldham in North Carolina. Thank you. Thank you very much. I thank all counsel for their submissions and their arguments. We will hold this case under advisement.